Okay, we'll turn to our second case. If we could get the lawyers to turn on their videos. The second case is number 21-13098. Ashley Scott versus the United States. Mr. Johnson. Thank you, Your Honor. May it please the court. Keith Howard Johnson for the appellant. In reviewing for oral argument today, although it's in our brief, I realized we probably didn't emphasize something enough. And so part of my argument will be on the quarter we won, which was the second quarter of 2007. And I'll explain that in a second. What we go back years and years, the district court originally ruled against us for responsibility. It went up to the appellate court and the appellate court was obviously bothered with whether the duties of Ashley Scott were ministerial or clerical versus decision making. So they reversed the district courts holding as the all 13 quarters and remanded it back for a The second trial eliminated 10 of the 13 quarters, which left us with three quarters. The most recent jury trial, they sustained the third quarter of 2005 and 2006. But they did not sustain the government on the second quarter of 2007. Now, what's important is, for that jury sent a message to the judge asking if the signature page for the return was available. The reply was it was not. And the jury ended up not sustaining government for that second quarter. So a reasonable and well, actually a clear and convincing interpretation of that is if that if Ashley Scott has signed that return, the jury would have held for the government on that quarter as well, because the two quarters, which are the third quarter 2005 and 2004, quarter 2006, were the only signed returns by Ashley Scott throughout the four years of the issue 2000. We're originally an issue. Can I can I just direct your attention for one moment? You know, as you know, this case has been here a few times with you can maybe call you a frequent flyer. But in any case, one of the times it was here, it was here on summary judgment. And we said that the issue was too close for us to determine on the papers, and that a jury trial was necessary. And so my question for you is, how does the evidence at trial differ substantially from what we had in front of us when it was up here on summary judgment? Because if it if there's not a material difference, that favors your client, in that respect, then isn't it law of the case already that there was enough evidence for a reasonable jury to return a verdict either way? Your Honor, a reading of Scott one would indicate the court was very disturbed with the holding of responsibility. It didn't say it. But I think a reasonable inference was that the court just didn't see anything above clerical or ministerial duties that were being performed by Ashley Scott. So the court remanded it back. Oh, Mr. Johnson, this is this is Judge Newsome. In fairness to Judge Rosenbaum's question, I mean, you're talking about what the court didn't say, but seem to have meant what the court did say, is there is evidence in the record that supports the government's argument that Scott was a responsible person. And she's asking you, if we said that, then what has changed since what changed that trial? Correct, Your Honor, the point I was leading up to is each of the trials, the evidence got worse and worse. By the third trial, there just wasn't anything of substance. And unless this court decides that the signing of those two returns, which were set up for a father to sign, it was set up for the president, they were signed at the last minute, when apparently the father was unavailable. And if she didn't sign those returns and send them out, they would have been late. So that's wasn't she also signing checks at the time of those quarters for other company expenses, knowing that these taxes were due and owing to the government? Well, no, the evidence establishes she didn't learn about the taxes until sometime in mid 2007, or even 2008. But going back to my room, what did the not the 941 form say when she signed them? They were blank? No, they showed a balanced due. But, you know, the reality is those are very complex forms people, you know, even if they look at them, they're not, they would have to study them to determine, oh, yeah, there's a balanced due. And then, if she that's a fair that I think that's a fair jury argument, that she didn't really understand what the forms said or what they meant. But you've got evidence showing that she was a corporate officer, she had authority to sign checks, that she signed these two form 940 ones, showing balances due. And at the time, she signed some checks paying other company debts, while relegating the taxes to the back burner. Why isn't that enough to sustain the jury's verdict on those two quarters? Because they weren't decision making. She didn't have the authority or the status, the duty or the authority to make those type decisions. Again, going back to the second quarter 2007, which is the one the jury did not sustain the government, she wrote two operating checks for that, that entire period. And from the jury question is clear, if she had signed that return, they would have held for the government, even though she signed two checks. And in the brief, we showed that for the third quarter, she only wrote 36 of a total of 439 checks, and none were over $1,000. And for the fourth quarter of 2006, she wrote 13 of 270 checks, and only two exceeded $1,000. So, but also on those checks that you're talking about, those aren't those checks outside of that. I mean, those are checks, not including the payroll checks. Yeah, we broke out, there was never any dispute that her primary responsibility was to either execute the payroll checks or testimony established she got a stamp. But there was also testimony that if she was out of town or not available on the Thursdays, then someone else would come in and use her stamp, including her brother and the office manager. Didn't she also use the payroll account to pay business expenses? Once, you know, sometimes, I mean, there wasn't sort of a strict distinction. The testimony was that her father kept the checkbook with him. So if, if he had the checkbook, and there were not checks available, then she would use, it was the same account, it was just a different sequence of numbers. Yeah, so I guess the question then is, it's hard for us to rely on the analysis that was done, because it doesn't include all of the checks that she wrote, including business checks that she wrote aside from payroll checks, because she wrote them on the payroll account. Isn't that right? No, there was no payroll count. They, the payroll checks were a different sequence of the same account number. So we spent dozens and dozens of hours going through checks. And as we pointed out in our brief, we actually included a few that probably should have been allocated towards payroll. So the, our Excel spreadsheets, which the government has had, you know, and certainly analyzed and had plenty of time to show defects or problems. That's, that's the, the operating checks. And it's an accurate breakdown of how many her brother wrote, how many her father wrote, how many she wrote. And, you know, with an accounting background, such as myself, to me, it's very illuminating. The Excel spreadsheets by themselves, tell the story, you'll see, when she writes checks, they're all, all congregated around the same time, other than she's occasionally writing for permits, or going to Target, things like that. But the, when there's a grouping of checks, you can see that her father's out of town. And the same with her brother. If she's out of town, then her brother coming in and writing those checks, and they're all on the same account. So the Excel spreadsheets, the first trial, we only had 2005. I'm sorry, just one other factual question about that. I thought, maybe I have this wrong, that there was evidence to trial that when she was signing some of these checks, her father was signing checks on the same day for other things, suggesting that he wasn't out of town. But maybe I misunderstood that. Right? Well, it was addressed at trial, and there was nothing conclusive, but it, you know, many people will take off at noon on a Friday, things like that. So it's, it's those times where there's overlap, are few and far between, whereas the, the gaps where he didn't write any checks, you can see where he went on a week vacation or two week vacation, things like that. And again, some of those checks, she had predetermined authority to go to Target or Walmart and buy supplies, things like that. So it's not overwhelming evidence, just because on a Friday or something that he wrote some checks in the morning, and she wrote some checks in the afternoon, because he had left and probably took the checkbook as well. Or he's, he's out of the office somewhere, maybe meeting with a customer or client, and they needed to check, you know, cut quickly. So if Ryan was there, Ryan would cut it. If Ashley was there, then Ashley would cut it. But again, the spreadsheets tell the true story. There's, she's writing predominantly most of her checks when her father's away. All right, Mr. Johnson, thank you very much. We'll give you your full time for rebuttal. Ms. Bradley. Good morning, your honors. May it please the court, Janet Bradley on behalf of the United States here. I'll start first with the question that Joe, Judge Rosenbaum just asked counsel for the appellant. In Scott one, the court did reverse and remand the district court's decision on summary judgment. The court held that it was too close of a question. The court noted that there was a variety of evidence for Ms. Scott, as well as for the government, and it determined that it was a question for the jury. So when I went back now, again, to a jury, a three day jury trial, there, there is additional evidence that wasn't present in Scott one that is present now. The first one was Scott did admit that she opened the company's sole bank account off of which checks, both for payroll and operating were written and that she didn't need to have a second signature in Scott one. I believe the court stated that she did not open or close bank accounts. So that that's a distinction here, which the jury heard. The second question was that she also wrote checks, operating checks while her dad was out of the office. And in fact, he was out of the office a lot, but on remand, there was additional evidence that on days when her dad was in the office, that she was writing checks to pay company vendors and other creditors. So unlike Scott one, where it said she didn't authorize payment of any bills to vendors or creditors, I think the evidence here again on remand, which was for the reasonable jury did show that she did pay bills and creditors. Third she also did sign the corporate employment returns here for the two quarters at issue. And she understood that only a corporate officer could do so. And again, on those returns, it does say that whoever's signing it declares under penalty of perjury, that the information is true, accurate, and correct. And here those returns did reflect large balances due to the two quarters. Also there was testimony here from the company's Ms. Scott on at least one occasion that Ms. Scott admitted that he informed her that there were balances, large balances due to the IRS. And Monike himself testified that he had told Ms. Scott on other occasions. Also, unlike Scott one, where the court determined that she didn't compile payroll information, here there was ample evidence showing that she not only provided information to the accountants to prepare the returns, but she kept track of employee withholding forms. Next, in Scott one, the court found that she did not guarantee or co-sign any loans. And here again on remand, there was evidence that she did personally guarantee debt for the in its opinion in Scott one, the government would submit that the district court directly denied Scott's motion for judgment as a matter of law. The overwhelming evidence here from which the reasonable jury could conclude was that she did have status, duty, and authority to make her to affirm the district court's judgment. All right. Thank you very much, Ms. Bradley. Mr. Johnson, you've got your rebuttal time available. Thank you, Your Honor. The additional evidence was fully vetted during the discovery phase and part of the motion for the opening and closing of the Compass Bank account. Obviously, that would be a change of bank. The facts established that the business was established in 1991. It was incorporated in 1992. Scott was still a minor at that time, actually a very young person. And so this would have been a shift over of one account to the other account. So the fact that daddy sent her to take care of this, you know, hardly arises to decision-making authority. The signing the tax return, even showing a balanced due, the evidence was clear that only Ty Scott had the PIN numbers and the ability to make an EFTPS deposit. At a certain point in time, you were required to make EFTPS deposits. Earlier, Ty Scott testified that he would prepare the deposits for dropping it off at the bank when they were done through coupons to make federal tax deposits. The CPA, again, he described her as the errand girl or the runner. He also testified that she had no ability to make the EFTPS deposits. That's the person who has to make the payments for the taxes. And beyond a certain date, you were not allowed to do coupons anymore. So again, it would have been impossible for her to even make it. I guess she could have sent in a check, but you know, those were large balances. The co-signing or the guarantee, the loan, there was ample testimony on that. The carrier was their number one vendor. Carrier was requiring all of the corporate officers to sign the guarantee. They did so to keep their line of credit in good order. The family members complained and they dropped the everybody but Ty Scott. And Mr. Scott's testimony was that was over a very short period of time. Further, there was nothing in the record establishing whether that occurred in 2000, excuse me, 2001, 2002, 2003, or during this timeframe. So even though it was established in the record, there was a short-term guarantee that was dropped because of the family's objection. It was mandated by carrier where you do lose a lot of credit. It doesn't show that it's relevant to these periods. So based on the totality of the evidence, there simply was not anything that was relevant to the decision-making. All of these are ministerial, clerical acts. Michael Jenkins' testimony is probably the best. He says Ashley Scott was basically incapable of making an independent decision. And in another place, he testified that he would hope she wasn't making decisions for the company. The decision-makers were Michael Jenkins, who was the treasurer and the main production guy, and her father, who were Ty Scott, who handled all the finances and those matters. So again, the jury just was never exposed or never saw any evidence showing that she had any level of decision-making authority that would rise to the point where she would be responsible under 6672. And if it's found that she is liable, this is very scary for all those clericals and secretaries that have check-signing authority because they're going to be captured by this low standard of decision-making authority when they really don't have any. So we would ask this court to consider, you know, what exactly the government is relying upon, consider whether that meets the threshold, and then reverse the jury determination as not being supported by the facts and the record. Thank you. Thank you very much, Mr. Johnson. Thank you, Ms. Bradley. We appreciate the help. Thank you.